# EXHIBIT A

## LIGHTNING NETWORK AGREEMENT
## FINAL VERSION

**AGREEMENT** dated as of January 11, 2007 (the "Effective Date") by and between WSI Corporation, a Massachusetts corporation with its principal place of business in Andover, Massachusetts ("WSI"), and TOA Systems, Inc., a Florida corporation with its principal place of business at 305 East Drive, Suite H, Melbourne, Florida 32904 ("TOA"). WSI and TOA are each referred to singly herein as a "Party" and collectively as the "Parties".

**WHEREAS,** TOA is in the business of designing, developing, producing, operating and maintaining sensors and programs for the detection, collection and processing of lightning data;

**WHEREAS,** TOA currently operates and collects lightning data from sensors located at various locations outside of the United States;

**WHEREAS,** TOA is developing a next generation sensor and program that enhances the detection efficiency of cloud to cloud lightning;

**WHEREAS,** WSI is in the business of acquiring, developing, producing and selling weather systems and weather information to customers worldwide;

**WHEREAS,** the Parties desire to enter into an agreement relating to the development and exploitation of a worldwide lightning data network based on existing TOA sensors and TOA's next generation lightning sensor technology;

**WHEREAS,** the parties desire to effect the foregoing and otherwise perform certain obligations and obtain certain rights, all as specified herein.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    **DEFINITIONS**

The following terms shall have the following meanings for purposes of this Agreement:

"Annual GLN Revenue Threshold" means the amount of GLN Revenues specified on Exhibit A for the applicable calendar year.

"Annual USLN Revenue Threshold" means the amount of USLN Revenues specified on Exhibit A for the applicable calendar year.

"Archived Data" means all data from the USLN and GLN stored, archived or otherwise in the possession of WSI from the Effective Date.

1
1/11/2007



"Display Software" means TOA's licensed software programs designed to display the Lightning Data to an end user thereof and including associated documentation and all enhancements, updates, modifications, derivative works and new releases or versions thereof developed by TOA or its affiliates during the term of this Agreement.

"Display Software Net License Revenues" means revenues recognized by WSI from the sale or licensing of the Display Software to third parties, excluding (i) sales, use and other taxes and similar charges collected by WSI from a licensee of the Display Software and (ii) fees from the sale, licensing or distribution of the Display Software deemed uncollectible by WSI based on WSI's actual loss experience or other reasonable accounting methodology.

"ELS Acceptance Criteria" means the criteria set forward in Exhibit B.

"ELS Development Schedule" means the schedule for the development and testing of the Enhanced Lightning Sensor attached hereto as Exhibit C.

"Enhanced Lightning Network" refers to a network constructed of TOA's next generation, dual band receiver and associated software processing and filters.

" Existing WDT Agreement" means the "Agreement to Develop and Operate a Lightning Detection Network with Coverage over the Continental United States" by and between TOA Systems, Inc. and Weather Decision Technologies, Inc. dated June 1, 2004 and all amendments thereto.

"Extraordinary TOA Default" means a default by TOA hereunder pursuant to Sections 14(a) or 14(b) below.

"Full Deployment" is defined as 200 sensors in USLN (or a number between 100 and 200 if both parties mutually agree), and 100 sensors in GLN.

"GLN" means the Existing GLN and all enhancements (in whatever form), additional Lightning Sensors, Enhanced Lightning Sensors or other components added thereto, pursuant to Section 3 below or otherwise, during the term of this Agreement.

"GLN Data" means any and all lightning data derived from the GLN.

"GLN Data Subscriptions" means the revenues associated with customers' subscription providing them a use license to GLN Data and GLN Lightning Products.

"GLN Lightning Products" means any Lightning Products of WSI including GLN Data.

"GLN Performance Requirements" means the service level and up time and other performance requirements for the GLN and the GLN Data specified on Exhibit G attached hereto.



1/11/2007

"GLN Revenue" means for any calendar year (or prorated portion thereof) (i) all GLN Data Subscriptions recognized by WSI from the sale, licensing or distribution of GLN Lightning Products excluding (x) sales, use and other taxes and similar charges collected by WSI from customers of the GLN Lightning Products and (y) fees from the sale, licensing or distribution of GLN Lightning Products deemed uncollectible by WSI based on WSI's actual loss experience or other reasonable accounting methodology, plus (ii) all amounts voluntarily added or contributed to GLN Revenues by WSI in sole and absolute discretion.

"Initial Launch Date" is the date when we will first charge clients a fee (pro-rated off of the full price), and is estimated to occur when 50% of the full deployment has occurred in the case of each network.

"Intellectual Property " means all of the following in any jurisdiction throughout the world:  (a) all inventions (whether or not patentable and whether or not reduced to practice), all improvements thereto, all  patents, patent applications, and patent disclosures, together with all reissuances, continuations, divisions, continuations in part, revisions, extensions, reissues and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names and corporate names, together with all translations, adaptations, derivations, registrations and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applicants, registrations and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know how, formulas, compositions, manufacturing and production processes and techniques (and documentation thereof), technical data, designs, drawings, and specifications) (f) all software (including source code, data, databases and related documentation), (g) all internet domain names, (h) all other proprietary rights, and (i) all copies and tangible embodiments thereof (in whatever form or medium).

"Internal Data Use" means use of Lightning Data by WSI other than in connection with delivery of a Lightning Product.   This term is intended to accommodate WSI's internal use of lightning data in its forecast operations center, and use of lightning data as an input into its numerical weather prediction systems and other forecast product generation.   Delivery of lightning data to end users, including prediction of lightning derived exclusively from real-time lightning data, will require such end users to enter into a lightning subscription contract with WSI, and would not be considered internal use.

"Licensed Software" means the Lightning Data Processing Software and Display Software.

"Lightning Data" means the GLN Data, and ULSN Data.

"Lightning Data Networks" means the GLN and USLN, and compromise the hardware and software associated with deployed lightning sensors as well as the software associated with the collection, processing, and redistribution of lightning data.

"Lightning Data Network Sensors" means all of the Lightning Sensors and Enhanced Sensors, and all hardware, software and equipment included therein, comprising the Lightning Data Networks.

3
1/11/2007



"Lightning Data Processing Software" means TOA's proprietary software programs necessary to ingest and process all Lightning Data and to operate and monitor Lightning Sensors and Enhanced Lightning Sensors, and including associated documentation and all enhancements, updates, modifications, derivative works and new releases or versions thereof developed by TOA during the term of this Agreement.

"Lightning Data Subscription" means the purchase of or subscription to WSI that enables the end user to receive Lightning Data Products associated with the USLN and/or GLN networks.

"Lightning Product" means any product or service of WSI displaying Lightning Data or using the Lightning Data to locate with precision any lightning strokes or flashes. For purposes of clarification, a "Lightning Product" would include a specific lightning forecast product, but would not include a weather forecast product or service using Lightning Data as an input.

"Lightning Sensor" means TOA's proprietary lightning sensor system which forms the basis of the Existing USPLN.

"Lightning Sensor Software" means any and all proprietary software of TOA included within a Lightning Sensor or Enhanced Lightning Sensor.

"New Sensors" means any and all Lightning Sensors and Enhanced Lightning Sensors added to the Lightning Data Networks pursuant to Section 3 below during the term of this Agreement, and all equipment, hardware and software included therein.

"New Sensor Fees" means all amounts paid by WSI for New Sensors pursuant to Section 6.2 below during the term of this Agreement.

"Owed Party" means the Party entitled to receive payments under a provision of this Agreement.

"Paying Party" means the Party obligated to make payments to the other Party pursuant to a provision of this Agreement.

"Preexisting TOA Technology" means any Technology of TOA which existed prior to the date of this Agreement.

"Preexisting WSI Technology" means any Technology of WSI which existed prior to the date of this Agreement.

"Remaining Contract Term" means the un-expired term of a contract between TOA and an Existing TOA Customer on the Effective Date. In no event shall the 'Remaining Contract Term' be deemed to include any renewal term of said contract, whether automatic or otherwise, effective subsequent to the Effective Date.



"Security Agreement" means the First Lien and Security Agreement attached hereto as Exhibit I granting WSI a first priority lien in the New Sensors.

"Technology" means designs, drawings, developments, techniques, inventions, processes, software programs, program source code, algorithms, and similar documents and other materials or other intellectual property.

"TOA Developments" means any lightning sensor or lightning data processing products or Technology, or other products or Technology that would be useful or beneficial in the operation of the Lighting Data Networks, developed by TOA during the term of this Agreement, other than Enhancements (as defined in Section 5.3) to Lightning Software.

"TOA Lightning Network Assets" means the Licensed Software and all of the assets which comprise and shall comprise the Lightning Data Networks (as defined in Section 3.1 below) including, without limitation, all Lightning Sensors and Enhanced Lightning Sensors acquired and added to the Lightning Data Networks pursuant to Section 3 hereof, and all Intellectual Property therein. "TOA Lightning Network Assets" shall not be deemed to include any hardware, software or other assets located at the WSI Facility, excluding the Licensed Software.

"TOA Lightning Product Net Revenues" means, for any calendar quarter (or prorated portion thereof), all revenue recognized by TOA (determined in accordance with GAAP) from the sale, licensing or distribution of Lightning Products during such quarter excluding (i) sales, use and other taxes and similar charges collected by TOA from customers of the Lightning Products and (ii) fees from the sale, licensing or distribution of Lightning Products deemed uncollectible by TOA based on TOA's actual loss experience or other reasonable accounting methodology.

"TOA Software" means the Licensed Software and the Lightning Sensor Software.

"TOA Software Source Materials" means all of the source materials (i.e. all materials useful for deducing the computer program's logic) related to the TOA Software, including without limitation the source code and documentation thereto.

"United States Aviation Market" means the Federal Aviation Administration, U.S. Armed Forces, individual aviators and all businesses primarily engaged in aviation related activities in the United States, including without limitation all United States airlines, Fixed Base Operators, airports, and general business, commercial and general aviation operators, pilots, and all resellers and distributors thereto

"USLN" means the United States cloud to cloud lightning network to be developed and implemented by TOA as provided in Section 3.4 below and including without limitation, the 200 Initial Enhanced Lightning Sensors (as defined below).

"USLN Data" means any and all lightning data derived from the USLN.



"USLN Performance Requirements" means the service level and uptime and other performance requirements for the USLN and the USLN Data specified on Exhibit G attached hereto.

"USPLN" means the Existing USPLN and all enhancements (in whatever form), additional Lightning Sensors, Enhanced Lightning Sensors, or other components added thereto, pursuant to Section 3 below or otherwise, during the term of this Agreement.

"USPLN Data" means any and all lightning data derived from the USPLN.

"Vaisala" means Vaisala, Inc. or any affiliate thereof or successor thereto.

"Worldwide Aviation Market" means all governmental aviation agencies (e.g. Air Forces, and Civil Aviation Authorities), individual aviators and all businesses primarily engaged in aviation related activities, including without limitation all commercial or governmental airlines, Fixed Base Operators, airports, and general business, commercial and general aviation operators, pilots, and all resellers and distributors thereto.

"WSI Archived Data" means Lightning Data retained, stored or archived by WSI during the term of this Agreement.

"WSI Derived Lightning Product" means any product or service of WSI which incorporates and modifies Lightning Data or which combines Lighting Data with other data, products or Technology of WSI or any third party or which is otherwise a WSI developed derivative of the Lightning Data.

"WSI Facility" means WSI's facility located at 400 Minuteman Road, Andover, Massachusetts or any successor facility of WSI so designated by WSI.

"WSI Lightning Product Net Revenues" means during any calendar quarter all lightning data subscriptions recognized by WSI from the sale of Lightning Data Subscriptions during such quarter, and further in all cases excluding (i) sales, use and other taxes and similar charges collected by WSI from customers of the Lightning Products and (ii) fees from the sale, licensing or distribution of Lightning Products deemed uncollectible by WSI based on WSI's actual loss experience or other reasonable accounting methodology.

2.    **BLANK**

3.    **DEVELOPMENT, DEPLOYMENT, OPERATION AND MAINTENANCE OF LIGHTNING DATA NETWORK**

3.1    **Creation of Lightning Data Networks**. TOA shall create, deploy, operate and maintain two lightning networks as provided in this Section 3. The lightning data networks shall be: GLN and USLN (collectively the "Lightning Data Networks"). The USLN



shall be based upon the Enhanced Lightning Sensor and shall be designed to collect and process cloud to cloud lightning data, as well as cloud to ground data, in the continental United States. GLN shall be designed to collect and process lightning data from sources outside the United States and from approximately fifteen (15) designated USLN sensors to be contributed to the GLN by TOA.

   3.2 **Implementation of Data Processing Centers**. (a) No later than sixty (60) days prior to the Initial Launch Date, once three sensors are deployed, TOA shall implement and begin testing the Lightning Data Processing Software at the WSI Facility. WSI shall be responsible for obtaining all hardware, third party software and network infrastructure ("System Infrastructure") necessary to host the Lightning Data Processing Software and shall pay TOA's reasonable out of pocket travel expenses incurred by TOA to implement the Lightning Data Processing System at WSI's facility.

   (b) TOA shall implement the Lightning Data Processing Software at a facility of TOA (the "TOA Facility") to back up the Lightning Data Processing Software at the WSI Facility. TOA shall bear the costs for providing back-up functionality (both systems and internet bandwidth) for USLN and GLN at the TOA Facility

   3.3 **USPLN**. (a) BLANK

   (b) The parties must mutually agree in advance, at any time thereafter, before TOA proceeds to add Lightning Sensors to USPLN beyond a total of 110 in aggregate, or to replace current sensors with enhanced sensors within the USPLN.

   3.4 **USLN**. (a) TOA shall complete the design, manufacture, and installation of five prototypes of the Enhanced Lightning Sensor, and shall provide to WSI all lightning data and TOA testing results, as provided in the ELS Development Schedule (Exhibit C). WSI shall test the Enhanced Lightning Sensor and Network. If WSI accepts the Enhanced Lightning Sensor and Network, it shall so notify TOA in writing ("Enhanced Lightning Sensor Acceptance"). If WSI rejects the Enhanced Lightning Sensor hereunder, and further if TOA is unable to make the requisite improvements within a sixty day cure period thereafter, then WSI has the option to decide whether to continue to market the USLN. WSI must inform TOA of its decision in writing within thirty days after the end of the cure period. If WSI chooses not to market USLN, then both parties may proceed as each sees fit with respect to the U.S. market, and this agreement will remain in force only as it pertains to GLN.

   (b) Upon Enhanced Lightning Sensor Acceptance, TOA shall produce and install between one hundred (100) and two hundred (200) Enhanced Lightning Sensors, the final number being determined in WSI's sole discretion after prototype testing, in a configuration that achieves effective comparable coverage to the USPLN for cloud to ground detection, and that TOA shall use its best efforts to have the Initial Enhanced Lightning Sensors manufactured as soon as possible. It is estimated that the manufacture process will take three (3) months. WSI shall pay for the Initial Enhanced Lightning Sensors, according to section 6.2. Beginning with the first USLN sensor installations, TOA shall operate the USLN and provide WSI with USLN

7

1/11/2007

Data in accordance with the USLN Performance Requirements. The USLN network shall be operated and processed as a separate network from the USPLN.

(c) If requested by WSI, TOA shall produce and install additional Enhanced Lightning Sensors as part of the WSI USLN or GLN at such locations as determined by WSI and WSI shall pay for such sensors as provided in Section 6.2 below.

3.5 **GLN**. (a) Beginning upon the Data Commencement Date, TOA shall operate the GLN and provide WSI with GLN Data in accordance with the GLN Performance Requirements.

(b) TOA shall produce and install one hundred (100) Lightning Sensors as part of the GLN. It is understood that the timetable for installation will depend in part on third parties outside of the Parties direct control, provided, however, that Fifty (50) of the Lightning Sensors (the "Initial GLN Sensors") shall be made available by TOA for installation within three (3) months after the contract with UPS is signed and the Initial GLN Sensors shall be installed as soon as possible thereafter. The remaining Lightning Sensors are targeted to be installed within six months after the Initial GLN Sensors are operational. The Parties will mutually agree on whether Lightning Sensors or Enhanced Lightning Sensors shall be deployed for this second phase at the time of Initial deployment, as well as the locations for the second phase of installations. WSI shall pay for such sensors as provided in Section 6.2 below.

(c) After the effective date, terms with respect to the incorporation of any data from an Existing Foreign Customer or Future Foreign Customer with respect to TOA's right to use data from such sensors must be mutually agreed with WSI, if such agreement includes the right of any such Foreign Customer to resell the data from GLN sensors not owned by such foreign Customer.

3.6 **Maintenance of Lightning Network**. TOA shall maintain all aspects of the Lightning Data Networks, including without limitation the repair or replacement of all Lightning Sensors included therein, to ensure compliance with its obligations hereunder.

3.7 **Transmission of Lightning Data**. Beginning upon the Data Commencement Date, TOA shall ensure timely transmission of the Lightning Data to the WSI Facility and the TOA Facility by the internet.

3.8 **Delivery of Lightning Products**. TOA shall enable WSI to install reasonable hardware and or software at the TOA Facility to enable direct transmission of the lightning data to customers. TOA shall, at their expense, acquire and maintain sufficient communication infrastructure at their facility to provide the backup distribution services. WSI shall be responsible for the delivery of Lightning Products to its customers or distributors, provided, however, that in the event it is unable to transmit the Lightning Products from the WSI Facility, TOA shall transmit the Lightning Products to WSI customers or distributors from the TOA Facility.



3.9    **Future Developments**.

      3.9.1    **Separation of Lightning Data**.  Not later than sixty days prior to Initial Launch of the USLN, TOA shall develop the capability to provide Lightning Data, and to allow WSI to distribute Lightning Products, both including (solely or combined with other Lightning Data) cloud to cloud lightning data and excluding cloud to cloud lightning data and shall provide WSI with any Technology required to implement the foregoing without royalty or other charge.

      3.9.2    **TOA Developments**.  Upon development and release, TOA agrees to make available for use with the Lightning Networks all TOA Developments at prices commensurate with those prices listed in Exhibit J, with the Parties sharing equally in the cost of such subsequent deployment, presuming mutual agreement to insert such development into the network.

4.    **RIGHTS TO LIGHTNING DATA**

      4.1    **WSI Rights to Lightning Data**.  TOA hereby grants WSI the following rights to the Lightning Data:

      4.1.1    BLANK

      4.1.2    **USLN Data**.  WSI shall have the worldwide, exclusive right and license to use, reproduce, display, exhibit, modify, create derivative works from, sublicense, distribute and resell the USLN Data, directly or indirectly, in any form or media, now existing or hereafter developed.  In the event USLN Revenues do not equal or exceed the Annual USLN Revenue Threshold in the first full calendar year following the fifth anniversary of the complete deployment and thereafter determined at the end of such calendar year, then the aforementioned exclusive USLN license shall thereafter be modified such that TOA shall thereafter have the right to resell and distribute the USLN Data directly and solely to end users thereof.  In addition, if the revenues do not exceed the Annual Threshold after year 5, TOA is enabled to sign VAR's on its own, subject to the common VAR price list.  WSI shall develop and maintain the VAR wholesale (where appropriate) and recommended retail price list for USLN data which it shall determine and change in its sole discretion.  Unless WSI has failed to achieve the revenue thresholds after year 5, WSI shall have the final decision as to whether to secure VAR resellers for a given market, and will consult with TOA before making such decision.  WSI's intention is to set prices to be on par with competitor's offerings, when such offerings are comparable in features, scope, and quality for each relevant market.  WSI will consult with TOA before determining its price list.

      4.1.3    **GLN Data**.  WSI shall have (i) a worldwide, exclusive right and license to use, reproduce, display, exhibit, modify, create derivative works from, sublicense, distribute and resell the GLN Data, directly or indirectly, in any form or media, now existing or hereafter developed, provided however, that in the event GLN Net Revenues do not equal or exceed the Annual GLN Revenue Threshold in the first full calendar year following the fifth



anniversary of the complete deployment and thereafter determined at the end of such calendar year, then the aforementioned exclusive GLN license shall thereafter be modified such that TOA shall thereafter have the right to resell and distribute the GLN Data directly and solely to end users thereof.   In addition, if the revenues do not exceed the Annual Threshold after year 5, TOA is enabled to sign VAR's on its own, subject to the common VAR price list.   WSI shall develop and maintain the VAR wholesale and recommended retail price list for GLN data which it shall determine and change in its sole discretion.   Unless WSI has failed to achieve the revenue thresholds after year 5, WSI shall have the final decision as to whether to secure VAR resellers for a given market, and will consult with TOA before making such decision.   WSI's intention is to set wholesale prices to be on par with competitor's offerings, when such offerings are comparable in features, scope, and quality for each relevant market.   WSI will consult with TOA before determining its price list.

　　　　4.1.4   **Archived Data**.  WSI shall have a perpetual, worldwide, nonexclusive right and license to use, reproduce, display, exhibit, modify, create derivative works from, sublicense, distribute and resell the Archived Data, directly or indirectly, in any form or media, now existing or hereafter developed

　　　　4.1.5  **USPLN.**  The parties agree that, in the event that WSI buys 50% of USPLN subsequent to this agreement, then paragraphs 4.1.2 and 4.1.3, and Exhibit A are modified as follows:

　　　　a) WSI has exclusive distribution rights to the aviation market for the term of the contract;
　　　　b) The USPLN and USLN combined threshold after year five is $2.5M per year;
　　　　c) WSI agrees that the $1.4M payment for 50% of the USPLN will not become a part of the security agreement.

　　　　4.2　　**TOA Rights; Certain Contracts**.  All rights to the Lightning Data not granted herein to WSI are reserved to TOA.

　　　　4.3　　**Sensor Hosting Arrangements**.  a) TOA shall have the right to secure an arrangement with United Parcel Service for hosting Lightning Sensors or Enhanced Lightning Sensors in exchange for Lightning Data.   The intent of the Parties is that United Parcel Service shall receive USLN and GLN Data free in return for its provision of shipping, installation, hosting, and maintenance services for a minimum of 50 sensor sites inside and outside the U.S.

## 5.　　SOFTWARE LICENSES AND MAINTENANCE

　　　　5.1　　**License to Lightning Data Processing Software**.  TOA hereby grants WSI a perpetual, royalty free nonexclusive license to use and reproduce the Lightning Data Processing Software at the WSI Facility, during the term of this agreement.

　　　　5.2　　**License to Display Software**.  TOA hereby grants WSI a worldwide, nonexclusive license to use, reproduce, resell, sublicense, and distribute, directly and indirectly, the Display Software.

10
1/11/2007

5.3    **Licensed Software Maintenance**. TOA shall (i) promptly correct any bugs or errors in the Licensed Software, (ii) provide WSI with technical support for the Licensed Software, and (iii) provide WSI with all updates, enhancements, revisions, derivative works and new releases and versions ("Enhancements") of the Licensed Software within five (5) days of the development and release of such Enhancements.

6.    **FINANCIAL TERMS**

6.1    BLANK

6.2    **Sensor Fees**. Subject to the final sentence of this Section 6.2, WSI shall pay TOA the fees specified on the Sensor Fee Schedule for the production and installation of each Lighting Sensor and Enhanced Lightning Sensor specifically ordered by WSI and added to the Lightning Data Network pursuant to Section 3 above. TOA shall have the right to invoice WSI for Lightning Sensors and Enhanced Lightning Sensors ordered for the WSI USLN and the GLN under Section 3 as follows: (i) 50% of the applicable fee within five (5) days of order, (ii) 20% of the applicable fee upon TOA's certification that the sensors have been assembled and (iii) 30% of the applicable fee upon  installation and successful testing of a sensor (defined as the sensor being installed at the host site, communications established between the host site and the WSI Facility, and the site delivering real-time data at a minimum 98% availability rate for at least one week). WSI shall pay all valid TOA invoices within thirty (30) days of receipt of invoice.    If imposed on purchase, WSI shall pay Florida sales tax where appropriate, as well as out of pocket shipping costs and  customs fees where applicable, for the sensor deployments ordered under Section 3.4(c). TOA shall pay the sales tax, shipping and installation costs associated with USPLN sensors, and deployments under Section 3.4(b) and 3.5(b).

6.3    **Fees From Lightning Revenues**.

6.3.1    **WSI Fee Obligation**. Within thirty (30) days of the end of each calendar month, WSI shall pay TOA fifty percent (50%) of WSI Lightning Data Subscriptions for USLN or GLN data collected from WSI end users in those markets where no VAR contracts have been written, 100% of the lowest equivalent VAR price on subscriptions from WSI end users in those markets where a VAR contract has also been written, and 50% of Revenues collected from VAR's recognized during such month.

6.3.2    **TOA Fee Obligation**. Within thirty (30) days of the end of each calendar month, TOA shall pay WSI fifty percent (50%) of TOA Lightning Product Revenues for USLN or GLN data collected from TOA end users in those markets where no VAR contracts have been written, and 50% of Revenues collected from VAR's recognized during such month.

6.4    **Internal Use of Lightning Data Fee**. WSI has the right to use lightning data for its Internal Data Use. WSI will pay a fee of $25,000 per year, payable on the first day of the calendar month following Full Deployment of the USLN network, and payable annually



on the anniversary dates thereafter for the remainder of the term, so long as WSI is using such lightning data for its internal use.

6.5    **Display Software Fees**.  Within thirty (30) days of the end of each calendar quarter, WSI shall pay TOA eighty percent (80%) of the Display Software Net License Revenues recognized by WSI during such quarter.

6.6    **Reimbursement of Certain Authorized Expenses**.  WSI shall pay for the reasonable out of pocket expenses of TOA expressly authorized pursuant to Sections 3.2 upon receipt valid and authorized invoices for such costs.  Except as otherwise expressly stated herein, each Party shall bear its own expenses in performing its obligations hereunder.

6.7    **No Other Participation Rights**.  Except as expressly stated herein, TOA and WSI shall have no rights to participate in any revenues of the other Party.  WSI shall determine the development, pricing, distribution and commercial exploitation, if any, and terms of sale of all WSI products and services, including without limitation any Lightning Product and Lightning Data Subscription of WSI, as it shall determine in its sole and absolute discretion.

7.    **REPORTS, RECORDS AND AUDITS**

7.1    **Reports**. (a)  Within thirty (30) days of the end of each calendar quarter, WSI shall send TOA a report specifying the amount of (i) the WSI Lightning Data Subscriptions recognized by WSI during such calendar quarter and (ii) the Display Software Net License Revenues recognized by WSI during such calendar quarter.

(b)  Within thirty (30) days of the end of each calendar quarter, TOA shall send WSI a report specifying the amount of TOA Lightning Product Net Revenues recognized by TOA during such calendar quarter.

7.2    **Record Keeping**.  During the term of this Agreement and for a period of one year thereafter, the Paying Party shall keep all usual and proper records and books of account and all usual and proper entries relating to amounts with respect to which it must pay the Owed Party hereunder in such detail so as to allow the Owed Party to enforce its rights hereunder.

7.3    **Audits**.  Upon fifteen (15) days notice, the Owed Party shall have the right, not more frequently than annually, to audit such books and records of the Paying Party to determine whether the Paying Party has complied with its obligations hereunder.  Any such audit hereunder may be conducted at the Owed Party's cost and expense and only during regular business hours at the Paying Party's' offices and in such a manner as not to interfere with the Paying Party's normal business activities and all information disclosed during such audit shall be treated as Confidential Information. In the event that any such audit reveals that the Paying Party underpaid the Owed Party by five percent (5%) or more with respect to any applicable period, the Paying Party shall pay the Owed Party's reasonable out of pocket audit expenses and the amount of such deficiency

12

1/11/2007



8.   **TERM**

8.1   **Term.** This Agreement shall terminate fifteen (15) years from the Effective Date, provided that it shall automatically renew annually for up to five additional years thereafter unless terminated by either Party upon notice to the other Party hereto at least one year prior to the end of the term.

8.2   **Certain Termination Consequences.** Upon the termination of the Agreement, WSI shall have a perpetual, royalty free, nonexclusive license to use, modify, create derivative works from, sell, sublicense, distribute, transmit or otherwise exploit in any form or media the WSI Archived Data.

9.   **BRANDING; MARKETING**

9.1   **Branding.** WSI shall brand all Lightning Products developed, sold or distributed by WSI as it shall determine in its sole discretion. WSI shall also have the exclusive right to brand the USLN as it shall determine in its sole discretion. WSI shall own all rights, title and interests in any trade or service marks and all goodwill accruing thereto during the term hereof associated with the foregoing brands. Each party shall only use the other party's trademarks with the prior written permission of the other party and in accordance with its guidelines.   The parties will mutually agree on the brand name for the GLN.

9.2   **Marketing and Promotion.** WSI shall be responsible for the marketing and promotion of the Lightning Data Networks, the type and level of which it shall determine in its sole discretion. WSI shall mention TOA on its website and in its marketing materials related to its participation in each of the Lightning Data Networks.

10.   **ASSET OWNERSHIP**

10.1   **TOA Lightning Network Assets.** TOA shall at all times own and hold title to all of the TOA Lightning Network Assets, any Preexisting TOA Technology and any Technology developed by TOA in connection with this Agreement or otherwise.

10.3   **WSI Intellectual Property.** WSI shall own all Intellectual Property in any Preexisting WSI Technology, any WSI Derived Lightning Product and any Technology developed by WSI in connection with this Agreement or otherwise.

10.4   **Jointly Developed Technology.** In the event the Parties jointly develop any Technology during the term of this Agreement ("Joint Technology"), the Parties shall agree in writing upon the use and exploitation of the Joint Technology and, absent such agreement, neither Party shall have the right to independently use or exploit such Joint Technology.



## 11.    LIMITED COVENANTS NOT TO COMPETE AND OTHER RESTRICTIONS; RIGHT OF REFUSAL

11.1    **Limitations on TOA**. (a) TOA agrees not to, directly or indirectly, participate in any way in the creation, development, , improvement, production, manufacture, distribution, operation, or selling of a lightning data system or network in the United States that is producing cloud to cloud data in the United States.    Notwithstanding the foregoing, TOA shall be entitled to sell a lightning network comprising Lightning Sensors, as well as local alarm devices and field mills, to a customer (including all affiliates of such customer) in the United States in connection with a local lightning network that services no more than a 2,500 square mile area.    Any such exceptions to this shall be mutually agreed.

(b)  TOA will not sell to, partner with, or participate in, a business involved with the creation of lightning data intended to produce global or near-global lightning detection capabilities similar or superior to the GLN, and to maintain an arms length relationship as a provider of software and sensors.

(c)  Except for sales of Lightning Data as expressly allowed in this Agreement, and except for its existing agreement with WDT, TOA shall not sell, license or distribute any lightning data to any third party.

11.2    **Limitation on WSI**.  WSI shall make commercially reasonable efforts to transition its current customers of lightning data from Vaisala to USLN within ninety days of full deployment of the USLN.    WSI shall cease to actively promote Vaisala data, and instead shall promote USLN data, to all new customers after that migration.    WSI reserves the right to provide Vaisala data to existing or new customers who express a preference for Vaisala data.

11.3    **WSI Right of Offer/ Refusal**. If, during the term of this Agreement, TOA at any time proposes to sell, transfer or otherwise dispose of substantially all of its assets, or its share in USPLN, or if TOA or Shareholder proposes to sell a majority or controlling interest of the stock of TOA (TOA or Shareholder hereinafter the "Selling Party") to any party other than a current shareholder in TOA Systems, the Selling Party shall first offer its interest for sale to WSI in writing ("Transfer Notice").

b) If TOA receives an offer to acquire a majority or controlling interest in USPLN or the stock or assets of TOA, TOA shall provide a Transfer Notice to WSI including a copy of the offer. The Transfer Notice shall offer to sell the interest upon the same terms and conditions at the same price as set forth in the offer of sale. Thereupon, WSI may, by written notice to the Selling Party accept the offer of sale pursuant to the Transfer Notice within twenty (20) days after receipt of the Transfer Notice. If accepted, the Selling Party shall sell its interest to WSI at the price and upon terms set forth in the Transfer Notice. If WSI fails to accept the offer within twenty (20) days following receipt of the Transfer Notice, then the Selling Party shall have the right to sell and transfer its interest at the same price and on the same terms and conditions provided that the sale shall occur within forty five (45) days after the date on which the original offer was made to WSI, and provided further that, the purchaser of such interest shall execute an appropriate instrument agreeing to be bound by the terms and conditions of this Agreement.

14
1/11/2007



11.4    **TOA Desire to move USLN assets.**  TOA does not have the right to move USLN sensors out of its network, unless mutually agreed between the parties.

11.5    **TOA Desire to sell its interest in USPLN.**  In the event TOA wishes to sell its shares in USPLN, WSI will have a right of first refusal on any such offer for TOA's shares, along the same guidelines as exist in 11.3b.

11.6    **TOA Desire to move GLN assets.**  TOA does not have the right to move GLN sensors out of its network, unless mutually agreed between the parties.

## 12.    CONFIDENTIALITY

12.1    **Confidential Information.**  It is expected that the Parties will disclose to each other certain information which it considers confidential or proprietary ("Confidential Information").  Confidential Information may include, but is not limited to, specifications, software packages, product and system documentation, system architecture, logic diagrams, software code, processes, product development plans,  marketing and business plans and financial information.    .

12.2    **Non-Confidential Information.**  Confidential Information shall not include all or any portion of such information that is (i) developed by the receiving Party independently of the disclosing Party as demonstrated by prior written documentation; (ii) rightly obtained by the receiving Party from a third party without restriction; (iii) publicly available other than through the fault or negligence of the receiving Party; or (iv) released without restriction by the disclosing Party.

12.3    **Restrictions.**  With respect to the other Party's Confidential Information, the receiving Party agrees (i) to use the Confidential Information solely for the purposes of this Agreement; (ii) not to disclose the Confidential Information to any third party or to any of their employees not bound to maintain its confidentiality and not having any need to know for the purposes of this Agreement; (iii) to take all reasonable steps, at least as great as the steps which the receiving Party takes with respect to its own Confidential Information, to protect the secrecy of and avoid the unauthorized disclosure or use of the Confidential Information; and (iv) to promptly notify the disclosing Party of any misuse, misappropriation or unauthorized disclosure which may come to its attention.

12.4    **Remedies.**  Each Party acknowledges that its obligations hereunder to protect the Confidential Information are essential to the business interests of the other Party and that the disclosure of such Confidential Information in breach of this Agreement would cause the disclosing Party immediate, substantial and irreparable harm, the value of which would be extremely difficult to determine.  Accordingly, each Party agrees that, in addition to any other remedies that may be available in law, equity, or otherwise for the disclosure or use of Confidential Information in breach of this Agreement, the disclosing Party shall be entitled to seek and obtain a temporary restraining order, injunctive relief or other equitable relief against

15
1/11/2007

the continuance of such breach, in addition to all other remedies, and without the requirement of posting a bond or undertaking or proving injury as a condition for relief.

13.    **REPRESENTATIONS, WARRANTIES AND INDEMNITIES**

13.1  **Representations and Warranties of TOA**.  TOA represents and warrants:

(a) TOA is a corporation duly organized, validly existing and in good standing under the laws of its state of organization.  It has the power and authority and all governmental licenses, authorizations, consents and approvals to execute and perform its obligations under this Agreement;

(b) TOA has all right and authority necessary to grant WSI the licenses and rights granted herein;

(c) TOA has secured an agreement with WDT that eliminates WDT's current rights to be a reseller of global data under clause 7 of the existing Amendment between TOA and WDT.

(d) BLANK;

(e) Upon payment of the Initial Fee as described in Section 6.2 above,  TOA shall own all rights, title and interests in the TOA Lightning Data Network Assets, including without limitation all Intellectual Property therein, and the TOA Lightning Data Network Assets shall not be subject to any liens or encumbrances of any kind;

(f)  The items listed on Exhibit L represent a true and complete list of all Intellectual Property related to the TOA Lightning Data Network Assets on the date hereof.  All TOA Listed Intellectual Property is owned by TOA free and clear of any liens or encumbrances of any kind.  All TOA Listed Intellectual Property is valid, subsisting, unexpired, in proper form and enforceable (with respect to the rights granted thereto) and all renewal fees and other maintenance fees that have fallen due on or prior to the Effective Date have been paid, and to the knowledge of TOA, no TOA Listed Intellectual Property is the subject of any proceeding before any governmental, registration or other authority in any jurisdiction, including any office action or other form of preliminary or final refusal of registration.

(g)  TOA owns all right, title and interest in the Intellectual Property necessary or useful to install, operate and maintain the USLN and GLN  and no such Intellectual Property is subject to liens or encumbrances of any kind;

(h)  BLANK;

(i) TOA has not infringed upon or misappropriated any Intellectual Property rights of third parties and the Intellectual Property of TOA does not infringe upon or constitute a misappropriation of any Intellectual Property right of any third party, and there is no claim suit,

16
1/11/2007



action or proceeding pending or, to the knowledge of TOA, threatened: (i) alleging any such infringement or misappropriation of any third party's intellectual property or other proprietary rights, or (ii) challenging TOA's ownership or use of, or the validity or enforceability of, any Intellectual Property of TOA, and to the knowledge of TOA, there is no reasonable basis for any such claim, suit, action or proceeding. TOA has not granted to any third party any right, license, permission or other interest in or with respect to any Intellectual Property owned by TOA and to TOA's knowledge, no third party is conducting its business in a manner which would conflict with, violate, misappropriate or infringe upon any Intellectual Property owned by or licensed exclusively to TOA;

(j) No present or former employee, officer or director of TOA or agent or outside contractor of TOA currently owns any right, title, or interest, directly or indirectly, in whole or part, in or to any Intellectual Property of TOA related to the TOA Lightning Data Network Assets. No portion of any material Intellectual Property of TOA related to the TOA Lightning Data Network Assets was jointly developed with any third party, except to the extent validly assigned in all respects to TOA;

(k) TOA have taken reasonable precautions to protect the Intellectual Property related to the TOA Lightning Data Network Assets and to maintain the confidentiality of the trade secrets, know how and other confidential Intellectual Property related to the TOA Lightning Data Network Assets. Without limiting the foregoing, to the knowledge of TOA, each employee and each consultant and independent contractor who has created any of the aforementioned Intellectual Property has signed an assignment or similar agreement with TOA confirming TOA's ownership of or, in the alternative, transferring and assigning to TOA all right, title and interest, including copyright and other intellectual property rights, in and to such individual's creative work product, and such agreements shall remain enforceable obligations;

(l) To the best knowledge of TOA, it has not committed any acts, or omitted to take any actions, which would cause a forfeiture or abandonment of any material rights in the Licensed Software or that would cause the Licensed Software to enter into the public domain. TOA possesses or has access to the original and, to best of TOA's knowledge, all copies of all documentation and all source code or password protected code, as applicable, for the Licensed Software.

(m) BLANK; and

(n) The Licensed Software shall perform in accordance with the specifications therefor during the term of this Agreement.

13.2    **Representations of WSI**. WSI hereby represents and warrants that WSI is a corporation duly organized, validly existing and in good standing under the laws of its state of organization and that it has the power and authority and all governmental licenses, authorizations, consents and approvals to execute and perform its obligations under this Agreement.



13.3    **Indemnification by TOA**. TOA hereby agrees to defend, indemnify and hold WSI, its officers, directors, employees, affiliates, successors and assigns from and against any claim, demand, loss, damage, expense, including reasonable attorneys fees, or liabilities whatsoever ("Claim") arising from or attributable any of the following: (a) a breach of any representation or warranty contained in Section 13.1 hereof; (b) any material breach of any of the obligations of TOA or Shareholder under this Agreement; and (c) any infringement, misappropriation, or misuse of any patent, copyright, trade secret or other intellectual property rights asserted by any third party against WSI arising from or related to the Lightning Data or the TOA Lightning Network Assets.

13.4    **Indemnification by WSI**. WSI hereby agrees to defend, indemnify and hold TOA, its officers, directors, employees, successors and assigns harmless from and against any Claim arising from (a) a breach of any representation or warranty contained in Section 13.2 hereof; and (b) any material breach of any of the obligations of WSI under this Agreement.

## 14.    DEFAULT; CERTAIN CONSEQUENCES

14.1    **Default**. A party shall be in default hereunder in any of the following cases (an "Event of Default"):

(a) Such party makes an assignment for the benefit of creditors or files a petition of bankruptcy, or for reorganization or rearrangement under any bankruptcy or insolvency law, or if any involuntary petition under any such laws is filed against such party,

(b) Such party is liquidated, dissolved or otherwise goes out of business, or

(c) Such party breaches any material obligation or representation under this Agreement and fails to cure such breach within thirty (30) days after written notice thereof by the other party.

In addition to any other remedies it may have at law or in equity, in the Event of a Default hereunder, the non-defaulting Party shall have the right to terminate this Agreement immediately upon notice to the other Party.

14.2.1 **Certain Liquidated Damages**  TOA acknowledges that WSI shall be making a substantial investment in the Lightning Data Networks in the form of the New Sensor Fees and that such investment may only be recovered by WSI by exploitation of the Lightning Data Networks pursuant to the terms of this Agreement.  WSI shall be relying upon the performance of TOA to recover these payments.   Accordingly, in the event of an Extraordinary TOA Default in addition to other rights and remedies WSI may have at law or in equity in such case, TOA hereby agrees that WSI shall incur damages equal to the New Sensor Fees (such amount then constituting the "WSI Liquidated Damages") and TOA shall be liable to WSI for the WSI Liquidated Damages.

18

1/11/2007

14.2.2 **Security Interest**. To secure payment of the WSI Liquidated Damages in the event of an Extraordinary TOA Default, TOA agrees to execute the Security Agreement contemporaneous with the execution of this Agreement and grants WSI a secured first priority lien in the New Sensors.

14.3.3 **Escrow of TOA Software Source Code**. (a) Upon the execution of this Agreement, TOA shall place in escrow, pursuant to an escrow agreement with an escrow agent agreed to by both parties (Iron Mountain, or some other well know agent), a copy of all of the TOA Software Source Materials. Within thirty (30) days of any such development, TOA shall update the escrow account with the source materials for any TOA Software updates, upgrades, new versions or releases or enhancements. WSI shall have the right to periodically audit, or have the escrow agent audit, the contents of the escrow account to determine TOA compliance with the obligations of this Section 14.3.3(a).

(b) The escrow agreement shall provide that WSI shall obtain access to the TOA Software Source Materials in the Event of an "Extraordinary TOA Default" hereunder (a "Triggering Event"). In the event of a Triggering Event, WSI shall thereafter have a nonexclusive, perpetual, royalty free license to use, copy, distribute, sublicense, modify and create derivative works from the TOA Software only for the purpose of continuing operation of the "Lightning Data Networks". WSI shall be responsible at all times for all fees of the escrow agent.

## 15.    LIMITATION ON LIABILITY

**IN NO EVENT SHALL A PARTY BE LIABLE TO ANY OTHER PARTY HERETO FOR SPECIAL, INDIRECT, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES OR FOR ANY DAMAGES RESULTING FROM LOSS OF USE, DATA, BUSINESS OR PROFITS, WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE AND REGARDLESS OF WHETHER SUCH DAMAGES OR LOSSES WERE FORESEEABLE.**

## 16.    FORCE MAJEURE

No Party will incur any liability to any other Party on account of any loss or damage resulting from any delay or failure to perform all or any part of this Agreement if such delay or failure is caused, in whole or in part, by events or occurrences beyond its reasonable control and without its negligence, including, but not limited to, strikes, riots, acts of war, acts of terrorism, earthquakes, fire, acts of God, acts in compliance of any law or government regulation, and other similar causes.

## 17.    MISCELLANEOUS

· 17.1    **Notices**. All notices required under this Agreement shall be made personally, by facsimile, overnight delivery by national deliver service, or by certified mail,



return receipt requested, and shall be deemed to have been properly given when delivered in writing in person, upon electronic confirmation when sent by facsimile, next day if sent by national overnight carrier or three days after being sent by certified mail to the following addresses:

WSI:           WSI Corporation
               400 Minuteman Drive
               Andover, MA 01810
               Fax No.:
               Attn: President

TOA:

17.2    **Waiver**.  No failure or delay on the part of any Party in exercising any right, power or privilege hereunder and no course of dealing between or among the Parties shall operate as a waiver of any right, power or privilege hereunder.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  No notice to or demand on any Party in any case shall entitle such Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of any Party to any other or further action in any circumstances without notice or demand.

17.3    **Independent Contractors**.  TOA and WSI shall be independent contractors with respect to each other and this Agreement shall not create in any manner and for any purpose any other relationship between such Parties whether as principal and agent, employer, employee, partners, co-venturers or otherwise.

17.4_    **Severability**.  In the event any of the provisions of this Agreement are held by a court of competent jurisdiction to be unlawful or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected, impaired or invalidated in any manner.

17.5    **Assignment**.  TOA acknowledges that WSI has entered into this Agreement based on the particular skills of TOA.  Accordingly, TOA shall not assign or transfer any of its rights and remedies or delegate any of its obligations under this Agreement, in whole or in part, without the prior written consent of WSI, which may be withheld by WSI in its sole discretion.  A change in control of fifty percent (50%) or more of the stock or voting ownership of TOA shall be considered an assignment of its rights and obligations under this Agreement, provided that in such case, and subject to Section 11.3 hereof, WSI shall not unreasonably withhold its consent to such a transfer.  Except in the case of the sale of substantially all of its assets, WSI shall not assign its or transfer its rights and remedies or delegate any of its obligations under this Agreement, in whole or in part, without the prior written consent of TOA, which consent shall not be unreasonably withheld.



17.6    **Headings**. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

17.7    **Governing Law; Venue.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule.    Any suit, action or litigation concerning or relating to this Agreement or the breach thereof shall take place exclusively in the federal or state courts located in the state of the defendant's principal place of business in such action and the Parties hereby expressly consent to the personal jurisdiction of and venue in such courts and waive all defenses of lack of jurisdiction and inconvenient forum with respect to such courts.

17.8    **Construction.** The language used in this Agreement shall be deemed to be the language chosen by the Parties hereto to express their mutual intent and no rule of strict construction shall be applied against a Party.

17.9    **Facsimile Signature; Counterparts**. This Agreement may be executed by facsimile signature and in counterparts.

17.10    **No Third Party Beneficiaries**. No third party shall be deemed a third party beneficiary of this Agreement or have any rights hereunder.

17.11    **Survival**. The following Sections shall survive the termination of this Agreement as necessary to give proper effect to their respective terms:  4.1.4,  7, 8.2, 10, 12, 13.3, 13.4, 15, and 17.

17.12    **Entire Agreement**. This Agreement contains the entire and only understanding between the parties and supersedes all prior agreements either written or oral relating to the subject matter hereof.  No modifications of this Agreement will be binding upon a party unless made in writing and signed by persons authorized to sign agreements on behalf of the parties hereto.



IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**WSI CORPORATION**

By:_____
            Authorized Signature

_____
            Printed Name

_____
            Title

**TOA SYSTEMS, INC.**

By:_____
            Authorized Signature

_____
            Printed Name

RODNEY   B.   BENT

_____
            Title

**Solely as to Section 11.3:**

_____
SHAREHOLDER

**Exhibit A:**

**Revenue thresholds**

<u>USLN</u>                                                                      <u>Revenue Threshold</u>

First full calendar year after fifth anniversary of full deployment    1,000,000


<u>GLN</u>                                                                       <u>Revenue Threshold</u>

First full calendar year after fifth anniversary of full deployment    $1,000,000

23
1/11/2007

**Exhibit B**

24
1/11/2007

**EXHIBIT C**
**ELS DEVELOPMENT SCHEDULE**

### New Lightning Match Filter Board Design:

| Anticipated date for board acceptance | ANTICIPATED COMPLETION DATE |
|---|---|
| | |
| First Board Testing Complete (lab testing only) | 30-Mar-07 |
| Second Board Testing Complete (With antennas on roof) | 30-May-07 |
| Final Board Approval with field testing. | 30-Jul-07 |

Page 25



**Exhibit G**

**Lightning Network Performance Requirements**

TOA is expected to replace faulty sensors within 14 days.

Measured on a weekly basis, TOA is expected to ensure transmission of lightning data at 95% uptime measured across the week from a minimum of 90% of the deployed sensors in the network to WSI.   Any general or widespread internet failure would be an exception to this requirement.



26

1/11/2007

**Exhibit J**

**Sensor Fee Schedule**

WSI USLN and GLN

Price for current generation sensors [FOB Melbourne]          $4,800 per sensor

Estimated price for next generation sensors [FOB Melbourne]    $tbd per sensor
The estimated cost is between $5,000 and $6,800.
The formula for the price of the new sensor shall be:
[(Invoiced parts cost * 1.10) + (Direct labor costs * 2.0)]

Fee for installation for sensors in the continental U.S.          $500 per sensor

For USLN and GLN, shipment and customs fees shall be borne by WSI if they aren't picked up by UPS.

TOA Lightning display Software recommended list price          $ tbd



27
1/11/2007

**Exhibit L**

**FIRST LIEN AND SECURITY AGREEMENT**

This Agreement is effective this _11_ day of _January_ , 2006 by and between TOA Systems, Inc., a Florida corporation with an office at 305 East Drive, Suite H, Melbourne, Florida 32904 (TOA") and WSI Corporation, a Massachusetts corporation with an office at 400 Minuteman Drive, Andover, Massachusetts 01810 ("Secured Party").

**BACKGROUND**

Secured Party and TOA have entered into a Lightning Data Network Agreement of even date herewith (the "Lightning Network Agreement") for the development, deployment and exploitation of United States and worldwide lightning data networks (the "Lightning Data Networks") as defined and provided therein. In connection with and pursuant to the Lightning Network Agreement, Secured Party is and shall be advancing substantial amounts (such amounts, as defined in the Lightning Network Agreement, constituting the "New Sensor Fees") to TOA for the acquisition of new lightning sensors to be included in the Lightning Data Networks (such sensors, as defined in the Lightning Network Agreement, constituting the "New Sensors"). As provided in the Lightning Network Agreement, TOA shall own the New Sensors. To recover the New Sensor Fees, Secured Party is relying upon TOA's performance of its fundamental obligations under the Lightning Network Agreement during the term thereof. Accordingly, the Parties have agreed in the Lightning Network Agreement that, in the event of an "Extraordinary TOA Default"(as defined in the Lightning Network Agreement), Secured Party will suffer damages equal to the New Sensor Fees (the "WSI Liquidated Damages") and TOA shall be liable to WSI for the WSI Liquidated Damages. Furthermore, TOA has agreed to enter into this First Lien and Security Agreement ("Security Agreement") and grant Secured Party a first security interest and lien in all of the New Sensors, and all rights to host or place such sensors, pursuant to this Security Agreement in order to secure repayment of the WSI Liquidated Damages.

TOA is entering into this Security Agreement with full knowledge of the extent of its obligations under the Lightning Network Agreement, the risk of an "Extraordinary TOA Default" under such agreement which shall give rise to the rights of Secured Party hereunder, and the fact that all the New Sensors may be seized and sold by Secured Party to satisfy repayment of the WSI Liquidated Damages.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. **Definitions**. The following terms shall have the following meanings for purposes of this Agreement:

28
1/11/2007

"New Sensors" means any and all Lightning Sensors and Enhanced Lightning Sensors added to the Lightning Data Networks pursuant to Section 3 (in the lightning network agreement) during the term of this Agreement, and all equipment, hardware and software included therein.

"New Sensor Hosting Rights" means all leases, site rights, contracts, licenses or other rights for the hosting of the New Sensors.

1. **Grant of Security Interest**. To secure its obligations under the Lightning Data Networks Agreement, and the prompt and complete repayment of the WSI Liquidated Damages, and this Security Agreement (the "Obligations"), TOA hereby assigns and grants to Secured Party a continuing a first lien and priority security interest under the Florida Uniform Commercial Code in the collateral consisting of all of the TOA's right, title and interest in and to all of the following, whether now owned or existing or hereafter acquired, created or arising and regardless of where located: all New Sensors and New Sensor Hosting Rights together with all cash and non-cash proceeds (including without limitation, insurance proceeds), products, distributions, additions, accessions, substitutions, exchanges and replacements of the New Sensors or New Sensor Hosting Rights only (collectively, the "Collateral").

2. **Filings**. On behalf of TOA, Secured Party shall prepare and file any and all necessary financing statements to record and perfect the security interest in the Collateral granted hereunder and Secured Party may file a copy of this Agreement in connection therewith. TOA hereby authorizes and appoints Secured Party and its attorney as TOA's attorneys-in-fact to execute any financing statements, including without limitation any UCC Form 1 or other Uniform Commercial Code filings, as necessary to carry out the provisions of this Agreement and to perfect, maintain and continue its security interest in the Collateral. TOA agrees to maintain the perfection of such security interest until the complete repayment of the WSI Liquidated Damages. TOA agrees to execute such financing statements or other instruments reasonably requested by Secured Party to perfect, maintain and continue the security interest.

3. **Representations and Warranties**. TOA hereby represents and warrants that:

(a) TOA is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida;

(b) TOA has the full power and authority to execute, deliver and perform this Security Agreement;

(c) The sole place of business of TOA is located at the address stated for it in the initial paragraph of this Security Agreement;

(d) The Security Agreement is a legal, valid and binding obligation of the TOA enforceable in accordance with its terms, subject to applicable laws affecting the enforcement of creditor rights; and

29

1/11/2007

(e) During the term of this Security Agreement, TOA will maintain good, clear and merchantable title to the Collateral and it will own the Collateral free and clear of any lien, security interest, charge or encumbrance, except for the rights created under this Agreement.

4. **Affirmative Covenants**. TOA hereby covenants and agrees with the Secured Party that, from the date of this Security Agreement until the Obligations are satisfied in full, TOA shall:

(a) Do all things necessary to maintain, renew and keep in full force and effect its organizational existence and all rights, permits and licenses necessary to enable it to continue the operation of the Lightning Data Networks;

(b) keep the Collateral in good repair and condition and be responsible for any loss or damage to it;

(c) Maintain insurance with respect to the Collateral in such amounts, against such risks, in such form and with such insurers, as shall be customary for businesses similar to the TOA's business, but in all cases in sufficient amount to allow replacement of the Collateral in the event of a casualty or similar loss; and

(g) Pay all taxes, assessments and other charges lawfully levied or assessed upon its properties or upon any of the Collateral when due.

Loss of, or damage to the Collateral or any part thereof will not release TOA from any of its obligations hereunder.

5. **Negative Covenants**. TOA hereby covenants and agrees with the Secured Party that, from the date of this Security Agreement until the Obligations are satisfied in full, TOA shall not:

(a)     Grant any security interest or other lien in the Collateral or execute or file a financing statement or security agreement covering the Collateral to anyone other than Secured Party;

(b)     Except as otherwise expressly permitted in the Lightning Data Networks Agreement, sell, convey, assign, lease, license or otherwise transfer any of the Collateral or any rights therein; and

(c)     Change, relocate or otherwise move its Business Address without thirty (30) days prior notification to the Secured Party.

6. **Remedies on Default**. In the event of an Extraordinary TOA Default as provided in the Lightning Network Agreement, or in the event TOA defaults on its obligations under this Security Agreement and does not cure such default within thirty (30) days of notification thereof from Secured Party, then Secured Party may, in addition to its other rights at law or in equity, or



under any other agreement, exercise with respect to the Collateral all of the rights and remedies of a secured party under the Florida Uniform Commercial Code.

7. **Expenses**. TOA will pay any and all reasonable expenses (including the reasonable fees and disbursements of its counsel) which the Secured Party may reasonably incur in connection with the exercise or enforcement of any of the rights of the Secured Party hereunder.

8. **Waiver**. Secured Party's failure, at any time or times, to require strict performance by TOA of any provision of this Agreement shall not waive, affect or diminish any right of the Secured Party thereafter to demand strict compliance and performance therewith. Any suspension or waiver by the Secured Party of an event of default shall not suspend, waive or affect any other event of default, whether the same is prior or subsequent thereto and whether of the same or of a different type.

9. **Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under the applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

10. **Notices**. Any notice or other communication to be given or made to either party shall be made at the addresses specified above. All notices given hereunder shall be in writing and deemed validly given (a) three (3) business days after sent, postage prepaid, by certified mail, return receipt requested, (b) one (1) business day after sent, charges paid by the sender, by Federal Express Next Day Delivery or other guaranteed delivery service, (c) when confirmation of transmission by facsimile during normal business hours is received, or (d) when delivered by hand, upon delivery, in each case to the intended recipient at its address.

11 **Governing Law**. This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Florida.

12. **Entire Agreement**. This Agreement, and all agreements and instruments to be delivered by the parties pursuant hereto or in connection herewith, represent the entire understanding of the parties with respect to the subject matter hereof, and supersede all other prior and contemporaneous agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.



1/11/2007

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed as a sealed instrument effective as of the date first above written.

WSI CORPORATION                      TOA SYSTEMS, INC.


By:_____         By:_____


_____            _____
Printed Name                         Printed Name


_____            _____
Title                                Title


32
1/11/2007